UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| KENNETH RACKEMANN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:18-cv-00232-JRS-DLP |
| ) | |
| REGINA ROBINSON, ) | |
| SAMUEL J. BYRD, ) | |
| MARY CHAVEZ, ) | |
| KIM HOBSON, ) | |
| ) | |
| Defendants. ) | |

**Order Granting Defendants' Motions for Summary Judgment,
Granting Other Pending Motions,
and Directing Entry of Final Judgment**

**I. Introduction**

Kenneth Rackemann is an Indiana Department of Correction (IDOC) inmate who at all times material to this lawsuit was incarcerated at the Wabash Valley Correctional Facility (WVCF) in Carlisle, Indiana. He brought this 42 U.S.C. § 1983 action on May 16, 2018, against a number of IDOC employees, contract medical providers, and physicians in private practice alleging deliberate indifference to his serious medical needs. After screening pursuant to 28 U.S.C. § 1915A, a voluntary dismissal, and a grant of summary judgment, four defendants remain, each a contract medical provider. Defendants Samuel J. Byrd and Mary Chavez, both physicians, and Health Services Administrator (HSA) Kim Hobson together move for summary judgment, and Nurse Regina Robinson separately moves for summary judgment. Mr. Rackemann has responded and requests summary judgment in his favor. Replies have been filed, and the motions are ready for decision. For the reasons explained below, the defendants' motions are granted.

## II. Summary Judgment Legal Standard

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017). The non-moving party bears the burden of specifically identifying the relevant evidence of record. *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015). This is in part because summary judgment is the "put up or shut up" moment in a lawsuit. *Grant*, 870 F.3d at 568.

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the respective motion was made. *Valenti v. Lawson*, 889 F.3d

427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

### III. Facts of the Case

Consistent with the legal standards set out above, the following facts are undisputed unless noted otherwise. *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014). That is, these statements of fact are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and any disputed evidence are presented in the light most favorable to the non-moving party. *Whitaker v. Wisc. Dep't of Health Serv's,* 849 F.3d 681, 683 (7th Cir. 2017). A fact not asserted by the parties may be included below if the record and/or the summary judgment evidence demonstrates the matter is true and material to the case.

Mr. Rackemann entered the IDOC system on or about April 22, 2016, arriving at the Reception Diagnostic Center (RDC). Dkt. 90-1 at pp. 156-63. While at the RDC he complained of chronic left flank pain during an intake medical examination by a nurse practitioner. *Id.* at pp. 148-53. The nurse ordered an x-ray of Mr. Rackemann's kidney, ureters, and bladder (a KUB), from which a radiologist assessed a "horseshoe kidney and a 9 mm, left renal calcification." *Id.* at p. 164. An ultrasound was recommended. *Id.*

On April 29, 2016, Mr. Rackemann was moved to WVCF. *Id.* at pp. 143-44. On May 4, 2016, defendant Dr. Samuel Byrd directed defendant HSA Kimberly Hobson to submit a request for Mr. Rackemann to have a renal ultrasound. *Id.* at pp. 130-31. The IDOC's Regional Medical Director diverted that plan and instead recommended laboratory work before scheduling the ultrasound, and Dr. Byrd concurred. Dkt. 90-5 at ¶ 6.

On May 13, 2016, Dr. Byrd saw Mr. Rackemann for complaints of abdominal pain present for the past five months. Dkt. 90-1 at pp. 127-29; dkt. 90-5 at ¶¶ 7-8. Mr. Rackemann reported a number of symptoms and conditions. Dr. Byrd conducted a physical examination. *Id.* He found that Mr. Rackemann was positive for symptoms of bloating, change in appetite, constipation, flatulence, nausea, back and flank pain, and diaphoresis (sweating). *Id.* Dr. Byrd thought Mr. Rackemann could be suffering from IBS-C (Irritable Bowel Syndrome with Constipation). Dkt. 90-1 at pp. 127-29; dkt. 90-5 at ¶¶. He prescribed Lactulose for the IBS, Pamelor for pain, and ordered a battery of laboratory tests. *Id.*

When he next saw Mr. Rackemann at a chronic care visit, On June 21, 2016, Dr. Byrd ordered two ECG studies to screen for irregular heart rhythm because Mr. Rackemann had reported chest pain during the preceding month. Dkt. 90-1 at pp. 110-13; dkt. 90-5 at ¶ 11. The ECGs were negative for irregular heart rhythm. *Id.* Mr. Rackemann still complained of abdominal pain, and Dr. Byrd noted that his laboratory tests showed moderate blood in Mr. Rackemann's urine, but no culture in the urine. *Id.* Dr. Byrd thought Mr. Rackemann could have nephritis, an inflammation of the kidney. *Id.* He noted the need for the renal ultrasound, considering that Mr. Rackemann had blood in his urine, and ordered additional laboratory tests. *Id.*

Mr. Rackemann sought medical attention on July 5, 2016, for chest pain. Dkt. 90-1 at pp. 95-102. An EKG indicated sinus arrhythmia. *Id.* He met with Dr. Byrd on July 13, 2016, when Dr. Byrd ordered a renal ultrasound to investigate the blood in Mr. Rackemann's urine. Dkt. 90-5 at ¶ 13; dkt. 90-1 at pp. 92-94. Mr. Rackemann had a retroperitoneal ultrasound which a radiologist interpreted as showing no mass or calcification in the kidneys, no horseshoe kidney, and no abnormal findings. Dkt. 90-1 at p. 169; dkt. 90-5 at ¶ 14. Mr. Rackemann was informed of these results. *Id.*

On October 30, 2016, Mr. Rackemann was in a nursing sick call complaining of abdominal pain and vomiting. Dkt. 90-1 at pp. 65-76. The next day Dr. Chavez examined Mr. Rackemann, noted he had vomited the past 3 days, had abdominal pain, and had diarrhea. *Id*. Dr. Chavez's evaluation included a deep palpation of Mr. Rackemann's abdomen, which she found benign. It did not elicit any objective response to pain. *Id.* Dr. Chavez ordered several laboratory tests to be performed "stat." *Id.*

A few days later, on November 5, 2016, Mr. Rackemann reported to a nurse that he was urinating blood. Dkt. 90-1 at pp. 56-64. He was seen later that day by a nurse for stomach pain. *Id.* By telephone, Dr. Byrd ordered an injection of ketorolac for pain and oral Bactrim, an antibiotic. *Id.*; dkt. 90-5 at ¶ 18. On the night of November 5, 2016, Mr. Rackemann came to nursing sick call for the third time that day, but he became belligerent and had to leave the infirmary. Dkt. 90-1 at pp. 54-55.

On November 9, 2016, Dr. Byrd again saw Mr. Rackemann to address his ongoing complaints of flank pain. *Id.* at pp. 50-53; dkt. 90-5 at ¶¶ 19-20. Dr. Byrd noted Mr. Rackemann's x-rays from RDC that indicated a horseshoe kidney and a kidney stone, but neither of these conditions had been reported by the radiologist following the recent renal ultrasound. *Id.* Mr. Rackemann's pain also occasionally occurred at rest. *Id.* Most of Mr. Rackemann's laboratory tests were within normal ranges, but half of the several urinalysis tests found blood in the urine. *Id.* Prescription medications had not been effective and had adverse side effects. *Id.*

Dr. Byrd's physical exam showed Mr. Rackemann had tenderness around the left hip, which was suggestive of a possible hip flexor injury. Dkt. 90-1 at pp. 50-53; dkt. 90-5 at ¶¶ 19-20). Dr. Byrd ordered another KUB, and pelvic x-rays, x-rays of the thoracic spine, and also ordered several laboratory tests. *Id.*

On November 13, 2016, a radiologist interpreted Mr. Rackemann's second KUB as showing a left renal kidney stone. Dkt. 90-1 at p. 247. The thoracic and pelvic x-rays were normal. Dkt. 90-5 at ¶ 21.

On December 2, 2016, medical staff responded to an emergency call that Mr. Rackemann had passed out. Dkt. 90-1 at pp. 30-39; Dkt. 90-5 at ¶ 23). Mr. Rackemann was conscious when nursing staff arrived, and he was transported to the prison infirmary. Dr. Chavez ordered medications and IV fluids. Dkt. 90-1 at pp. 30-39; Dkt. 90-5 at ¶ 23. Dr. Chavez sent Mr. Rackemann to Terre Haute Regional Hospital by ambulance for further evaluation. Dkt. 90-1 at pp. 30-39; dkt. 90-5 at ¶ 23.

At the hospital, Dr. Bhanat Dave, a urologist, diagnosed Mr. Rackemann with a large left kidney stone. Surgery was performed to insert a stent in Mr. Rackemann's left kidney to let the kidney stone pass. Dkt. 90-1 at pp. 28-29; dkt. 90-5 at ¶ 23. Mr. Rackemann spent one night in the hospital and returned to WVCF on December 3, 2016. *Id.* Dr. Dave requested to see Mr. Rackemann for a follow-up in one to two weeks. *Id.*

Dr. Byrd saw Mr. Rackemann on December 6, 2016. Dkt. 90-1 at pp. 13-16; dkt. 90-5 at ¶ 24. A request for a follow-up visit with Dr. Dave to remove the stent and kidney stone were made. Dkt. 90-1 at pp. 11-12.

Mr. Rackemann had the follow-up visit with Dr. Dave on January 13, 2017. Dr. Dave performed a shock wave procedure to break up the kidney stone while Mr. Rackemann was under general anesthesia. Dr. Dave decided to keep the stent in place to allow the stone fragments to pass. Dkt. 90-1 at pp. 8-9. Dr. Dave requested to see Mr. Rackemann in two weeks for stent removal. *Id.* at pp. 298.

6

When Mr. Rackemann was returned to WVCF, a medical staff member incorrectly wrote on a Provider Consultation Report that Mr. Rackemann's stent had been removed by Dr. Dave on January 13, 2017. Dkt. 90-1 at p. 291. When Dr. Byrd saw Mr. Rackemann on January 24, 2017, he wrote in the visit notes that Dr. Dave had left the stent in place and was supposed to return to Dr. Dave in "the next week." Dkt. 90-1 at p. 3; dkt. 90-5 at ¶¶ 27-29. Mr. Rackemann asserts that Dr. Byrd told him the stent had been removed and that Mr. Rackemann's understanding that the stent had not been removed was wrong. Dkt. 98 at p. 5.

It was not until February 20, 2017, that a nurse followed-up on Dr. Byrd's order to schedule Mr. Rackemann to see Dr. Dave again, and when the appointment was scheduled, it was not until March 21, 2017. Dkt. 90-2 at pp. 128-30; dkt. 90-5 at ¶ 29. Dr. Byrd testifies that the appointment date with Dr. Dave was beyond WVCF's control. Dkt. 90-5 at ¶ 29.

Mr. Rackemann came to sick call on March 7, 2017, complaining of pain and a burning sensation when he urinated. Dkt. 90-2 at pp. 124-26. On March 10, 2017, Dr. Byrd ordered medications for a possible urinary tract infection. Dkt. 90-2 at pp. 120-21; dkt. 90-5 at ¶ 31.

On March 20, 2017, Nurse Hobson saw Mr. Rackemann in nurse sick call for his complaints of left flank pain. Dkt. 90-2 at pp. 115-19; dkt. 90-6 at ¶ 9. She contacted Dr. Byrd who prescribed an opioid pain medication until Mr. Rackemann could see Dr. Dave the next day. *Id.*

On March 21, 2017, at 7:25 a.m., Mr. Rackemann came to nurse sick call complaining of nausea, vomiting all day, fever, chills, and flank pain. His temperature was 102°. Dkt. 90-2 at pp. 108-11; dkt. 90-5 at ¶¶ 33-34. Dr. Byrd ordered medications and had medical staff monitor Mr. Rackemann in the infirmary for two hours. *Id.* Mr. Rackemann's renal function had tested normal less than one month before, so Dr. Byrd ordered a STAT CBC and CMP. *Id.* He suspected Mr. Rackemann's could have acute pyelonephritis, an infection of the kidneys. *Id.* But the

laboratory results showed a normal white blood cell count and normal kidney function. *Id.* Due to Mr. Rackemann's illness, his appointment with Dr. Dave was canceled and rescheduled. *Id.*

Two hours later when his temperature had gone down to 100.4°, Mr. Rackemann was returned to his cell. *Id.* At some point, Mr. Rackemann was admitted to the infirmary.

On March 23, 2017, Dr. Chavez ordered narcotic pain medication for Mr. Rackemann's pain. Dkt. 90-2 at p. 90. That same day Mr. Rackemann's urine culture test results reported negative for infection. Dkt. 90-2 at pp. 83-84; dkt. 90-5 at ¶ 35. Dr. Byrd suspected the negative urine culture report could be a "false negative" because Mr. Rackemann was on Cipro at the time the urine culture was obtained. *Id.* Dr. Byrd consulted the regional medical director, Dr. Kuenzli, about Mr. Rackemann's treatment plan, and decided to start Mr. Rackemann on medications to better treat a potential kidney infection. *Id.* Mr. Rackemann continued to receive narcotic pain medication. *Id.* The next day, March 24, 2017, Dr. Byrd added Tylenol in addition to the narcotic pain medication to address Mr. Rackemann's reports of increased pain. Dkt. 90-2 at pp. 78-79; dkt. 90-5 at ¶ 37.

On March 27, 2017, Dr. Byrd examined Mr. Rackemann in the infirmary. Dkt. 90-2 at pp. 57-59; dkt. 90-5 at ¶ 37. Dr. Byrd noted that a second urine culture had also returned negative for infection. *Id*. Mr. Rackemann's fever had resolved a few days prior, but Mr. Rackemann still reported debilitating pain despite not appearing to be in any distress. *Id.* Dr. Byrd noted that Mr. Rackemann's normal vital signs did not support Mr. Rackemann's complaints of severe pain, but Mr. Rackemann continued to receive narcotic pain medication. *Id.*

On March 31, 2017, Dr. Byrd discharged Mr. Rackemann from the infirmary. Dkt. 90-2 at pp. 19-27; dkt. 90-5 at ¶ 38. Dr. Byrd believed that Mr. Rackemann's symptoms were not caused by a kidney infection, but by influenza, as numerous members of Mr. Rackemann's housing unit

also had influenza, and Mr. Rackemann's fever went away within a day and his urine cultures were negative. *Id.*

On April 13, 2019, Mr. Rackemann returned to Dr. Dave, but Dr. Dave was unable to remove Mr. Rackemann's ureteral stent because the kidney stone fragments had not yet passed through the stent. Dkt. 90-2 at pp. 15-16; dkt. 90-5 at ¶ 40. On April 21, 2017, Mr. Rackemann returned to Dr. Dave, who removed Mr. Rackemann's stent after determining that the kidney stone fragments had passed. Dkt. 90-2 at pp. 5-6; dkt. 90-5 at ¶ 41.

In the months following Mr. Rackemann's stent removal, Mr. Rackemann continued to be treated with an array of medications to address his abdominal discomfort. Dkt. 90-5 at ¶ 42. Mr. Rackemann was also sent to a specialist for a colonoscopy and an EGD, both of which were normal expect for a small colon polyp, which was removed. *Id.*

On March 1, 2019, Mr. Rackemann attacked Dr. Byrd in the WVCF medical unit, striking him multiple times in the head. Dkt. 90-5 at ¶ 46; dkt. 90-4 at pp. 9-11. Mr. Rackemann had to be forcibly removed from the exam room. *Id.*

HSA Hobson's role in Mr. Rackemann's treatment history was limited. HSA Hobson received a grievance from Mr. Rackemann on or about May 19, 2017. Dkt. 90-6 at ¶ 10. She investigated Mr. Rackemann's claims by reviewing his medical records, speaking with the medical provider, and speaking with Mr. Rackemann. *Id.* HSA Hobson verified that Mr. Rackemann had an active treatment plan in place to address his complaints of flank pain, and verified that Mr. Rackemann had seen the medical provider numerous times, as well as a urology specialist. *Id.* She also noted that Mr. Rackemann had an appointment scheduled with a urologist. *Id.* HSA Hobson responded to Mr. Rackemann's grievance on June 7, 2017, and instructed him to address any ongoing medical concerns with his medical provider or his urologist. *Id.*

Nurse Robinson's role in Mr. Rackemann's treatment was similarly limited. On April 12, 2017, she received an informal grievance from Mr. Rackemann, dated April 9, 2017, which asserted that medical staff had failed to properly treat his kidney stone and stent removal during the period January 13 through April 9, 2017. Dkt. 94-1 at ¶ 4; dkt. 94-4. She investigated by reviewing the medical records and determined that Mr. Rackemann had an off-site specialist appointment scheduled for March 21, 2017, but that his appointment was cancelled after it was determined that he had flu-like symptoms. Dkt. 94-1 at ¶ 5. She also noted that Mr. Rackemann had been rescheduled to be seen by the specialist at an upcoming date, but due to IDOC security policies, Nurse Robinson could not reveal the date of the appointment to him. *Id.* Nurse Robinson responded to Mr. Rackemann's grievance with this information the same day she received it. *Id.* She made no decisions in any of the treatments Mr. Rackemann received. *Id.* at ¶¶ 7-10. Her role was limited to reading Mr. Rackemann's grievance, reviewing the medical records, and responding to him. *Id.*

Mr. Rackemann asserts that he encountered HSA Hobson on other occasions where she belittled him and called him names. Dkt. 98 at pp. 6-7. He does not point to a medical record or any other evidence to support his assertion.

## IV. Discussion

Mr. Rackemann's § 1983 claims for deliberate indifference to his serious medical needs arise, because he is a convicted offender, under the Eighth Amendment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Prison officials have a duty to provide humane conditions of confinement, which includes *adequate* medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To prevail on a deliberate

indifference to serious medical needs claim, Mr. Rackemann must show that (1) he suffered from an objectively serious medical condition, and (2) the defendant knew about the condition and the substantial risk of harm it posed but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison*, 746 F.3d 766, 775 (7th Cir. 2014); *see also Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (*en banc*) ("To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition."). To elaborate further:

> To prove deliberate indifference, mere negligence is not enough. A plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm. The linchpin is a lack of professional judgment. A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances. A prison medical professional faces liability only if his course of treatment is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Campbell v. Kallas*, 936 F.3d 536, 544-45 (7th Cir. 2019) (internal citations and quotations omitted). To elaborate even more, deliberate indifference means a culpable state of mind equivalent to criminal recklessness. *Rivera v. Gupta*, 836 F.3d 839, 842 (7th Cir. 2016).

The defendants concede that Mr. Rackemann's issue here constitutes a serious medical need. *See* dkt. 90 at p. 15.

But, applying these standards to the undisputed facts, no reasonable trier of fact could conclude that the defendants were deliberately indifferent to Mr. Rackemann's serious medical needs.

### A. HSA Hobson, Nurse Robinson, and Dr. Chavez

Each of these medical providers had a very limited role concerning Mr. Rackemann. HSA Hobson's role was limited to reviewing a grievance and responding. She investigated the grievance and responded to Mr. Rackemann advising him he was scheduled to be seen by the urologist in the very near future. HSA Hobson did not provide medical services to Mr. Rackemann. He has provided no evidence otherwise. In his complaint, Mr. Rackemann asserted that HSA Hobson covered up other providers' deliberate indifference. Bypassing whether such conduct could itself be deliberate indifference, Mr. Rackemann has provided no evidence to support the assertion. Summary judgment is the "put up or shut up" stage of a case, and Mr. Rackemann has failed to "put up" evidence to defeat HSA Hobson's motion for summary judgment. *See Grant*, 870 F.3d at 568. HSA Hobson is entitled to summary judgment.

Nurse Robinson's role was, like HSA Hobson's, extremely limited. Her role was also addressing a single grievance. Dkt. 94-1 at ¶¶ 7-10. She reported to Mr. Rackemann exactly what was in his medical records. *Id.* Mr. Rackemann asserts, without evidentiary support, that Nurse Robinson was involved in the cover-up of others' deliberate indifference and contributed to the delay and mistreatment of his kidney stone. Because no evidence has been provided sufficient to show a genuine issue of material fact, Nurse Robinson is also entitled to summary judgment.

Mr. Rackemann asserts Dr. Chavez was deliberately indifferent to his serious medical needs. But he has provided no evidence to support the claim, fails to cite to the record even one instance when her conduct could be interpreted, giving Mr. Rackemann the benefit of all reasonable inferences, as deliberate indifference. In the very few times Dr. Chavez saw Mr. Rackemann, she conducted examinations, prescribed medication, ordered IV fluid administration, and sent him to the hospital by ambulance. Dkt. 90-1 at pp. 30-39. There is no

indication in any of the encounters that Dr. Chavez ignored a serious medical condition. Dr. Chavez is entitled to summary judgment.

### B. Dr. Byrd

Mr. Rackemann contends that Dr. Byrd was deliberately indifferent to his kidney stone, causing him months of unnecessary pain, and deliberately indifferent to the issue of the stent remaining in his body too long.

It is concerning that when Mr. Rackemann arrived from RDC with the radiologist's report that his x-ray indicated a horseshoe kidney and a 9 mm kidney stone, Dr. Byrd acceded to the Regional Medical Director's order that a battery of laboratory tests be done before ordering an ultrasound. The question is whether Dr. Byrd's deference to the Regional Medical director's treatment plan was a reasonable professional judgment. Mr. Rackemann has to point to evidence that Dr. Byrd actually knew of and disregarded a *substantial risk* of harm that, in turn, demonstrates a lack of professional judgment. *See Campbell,* 936 F.3d at 544-45. Mr. Rackemann has not done so.

As Mr. Rackemann continued to report chronic pain is his lower flank, Dr. Byrd ran numerous tests and prescribed different medications. He came to the conclusion that a renal ultrasound was appropriate and ordered it. However, the radiologist report on this test found no abnormalities. Still, Dr. Byrd continued to address Mr. Rackemann's complaints at every meeting they had. Whether he *properly* addressed Mr. Rackemann's pain is not the question, because deliberate indifference "requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk." *Huber v. Anderson*, 909 F.3d 201, 208 (7th Cir. 2018) (internal quotation omitted). A plaintiff might be able to demonstrate deliberate indifference if the defendant's treatment plan was blatantly

13

inappropriate. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Mr. Rackemann has no evidence that Dr. Byrd's treatment of his pain was blatantly inappropriate, especially in light of the ultrasound finding of no abnormalities.

The final issue to address about Dr. Byrd's treatment of Mr. Rackemann concerns the stent removal. The uncontested facts demonstrate that Dr. Byrd had almost nothing to do with the scheduling of Dr. Dave's stent removal. When Mr. Rackemann was returned from his second visit with Dr. Dave, a medical staff member – not Dr. Byrd – incorrectly wrote on a Provider Consultation Report that Mr. Rackemann's stent had been removed. Dkt. 90-1 at p. 291. When Dr. Byrd saw Mr. Rackemann on January 24, 2017, he wrote in the visit notes that Dr. Dave had left the stent in place and Mr. Rackemann was supposed to return to Dr. Dave in "the next week." Dkt. 90-1 at p. 3; dkt. 90-5 at ¶¶ 27-29. Assuming for summary judgment purposes that Dr. Byrd was under the impression that the stent had been removed, there still is no connection shown between that wrong assumption and anything Dr. Byrd did to delay further visits with Dr. Dave. At this meeting, Dr. Byrd wrote an order for Mr. Rackemann to return to Dr. Dave. *Id.*

It is unfortunate that it was not until February 20, 2017, that a nurse followed-up on Dr. Byrd's order to schedule the follow-up. Dkt. 90-2 at pp. 128-30. By that time, the first available appointment was March 21, 2017. *Id.* Mr. Rackemann provides no evidence that Dr. Byrd was involved with or caused the delay in scheduling the follow-up appointment.

While Mr. Rackemann asserts that he never had flu symptoms on March 21, 2017, the medical record shows that Mr. Rackemann came to nurse sick call complaining of nausea, vomiting, fever, chills, flank pain, and a temperature of 102°. Dkt. 90-2 at pp. 108-11; dkt. 90-5 at ¶¶ 33-34. Due to Mr. Rackemann's illness, his appointment with Dr. Dave was canceled and rescheduled. *Id.* There is no evidence that Dr. Byrd was responsible for these events. Dr. Byrd also

testifies that at the same time several other inmates in Mr. Rackemann's housing unit had influenza. Dkt. 90-5.

Mr. Rackemann saw Dr. Dave on April 13, 2019. There is no explanation in the record for this delay, but likewise there is no evidence that Dr. Byrd was responsible for it, much less that any delay in the record had any impact on how long the stent remained in place. Indeed, Dr. Dave decided not to remove Mr. Rackemann's stent sooner because the kidney stone had not yet passed. Dkt. 90-2 at pp. 15-16; dkt. 90-5 at ¶ 40. Finally, on April 21, 2017, Dr. Dave removed the stent only after finding the stone had passed. Dkt. 90-2 at pp. 5-6; dkt. 90-5 at ¶ 41. Again, Mr. Rackemann provides no evidence that any delay in this timeframe was caused by Dr. Byrd.

There is little doubt that Mr. Rackemann suffered in pain for months from a kidney stone. There is, however, no evidence that during this time Dr. Byrd was deliberately indifferent to Mr. Rackemann's serious medical needs. The record shows frequent consultations, prescriptions, laboratory tests, and examinations during the period at issue. The providers here did not employ a known futile treatment plan or rigorously employ an ineffective one. They progressively tried different approaches. A different physician might have treated Mr. Rackemann's condition differently, and perhaps could have alleviated the pain sooner. But constitutionally, Mr. Rackemann is not entitled to the best medical care possible, only to adequate medical care. *See Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Dr. Byrd's treatment of Mr. Rackemann was, at a minimum, constitutionally adequate.

Because Mr. Rackemann has failed to provide evidence to support his deliberate indifference claim against Dr. Byrd, and because the evidence demonstrates an entitlement to summary judgment, Dr. Byrd's motion for summary judgment will be granted.

### V. Conclusion

For the reasons explained above, the defendants' motions for summary judgment, dkt. [89] and dkt. [92], are **granted**. Mr. Rackemann's request for summary judgment presented in his response is **denied**. This action is **dismissed** with prejudice. Dr. Dave's motion to enter final judgment, dkt. [104], deferred until the close of this action, is **granted**. Mr. Rackemann's motion to correct clerical error, dkt. [106], is **granted**. The original error played no part in the Court's decision. Consistent with the Court's screening order of August 14, 2018 (dkt. [11]), the dismissal of a party on November 30, 2018 (dkt. [43]), a grant of summary judgment on September 27, 2019 (dkt. [103]), and this Order, final judgment shall now enter.

**IT IS SO ORDERED**.

Date: 3/27/2020

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Kenneth Rackemann
132668
Westville Correctional Facility
Electronic Service Participant – Court Only

Alex Maurice Beeman
Reminger Co. LPA (Indianapolis)
abeeman@reminger.com

Douglass R. Bitner
Katz Korin Cunningham, P.C.
dbitner@kkclegal.com

Jeb Adam Crandall
Bleeke Dillon Crandall Attorneys
jeb@bleekedilloncrandall.com

Christopher Andrew Farrington
Bleeke Dillon Crandall Attorneys
drew@bleekedilloncrandall.com

Ronald A. Mingus
Reminger Co. LPA (Indianapolis)
rmingus@reminger.com

Nathan Aaron Pagryzinski
Bleeke Dillon Crandall, P.C.
nathan@bleekedilloncrandall.com